# In the United States Court of Federal Claims

### No. 10-724C
### (Filed: August 16, 2011)

```
* * * * * * * * * * * * * * * * * * * *    *
                                           *
PAUL L. WILLIAMS,                          *   Military Pay Act; Challenge to
                                           *   Disability Rating; Concurrence with
                         Plaintiff,        *   Informal Physical Evaluation Board's
                                           *   Findings and Recommendations;
              v.                           *   Voluntariness of Waiver of Right to
                                           *   Challenge Disability Rating;
THE UNITED STATES,                         *   Voluntariness of Retirement
                                           *
                         Defendant.        *
                                           *
* * * * * * * * * * * * * * * * * * * *    *
```

*Jason E. Perry*, Cheshire, CT, for plaintiff.

*Michael D. Snyder,* United States Department of Justice, Washington, DC, with whom were *Tony West,* Assistant Attorney General, *Jeanne E. Davidson,* Director, and *Deborah A. Bynum*, Assistant Director, for defendant. *Captain Rachel A. Landsee*, U.S. Army Litigation Division, Arlington, VA, of counsel.

### O P I N I O N

**FIRESTONE**, *Judge*.

This case involves a dispute over the discharge of, and disability rating conferred

upon, a former Lieutenant Colonel in the United States Army Reserve. Currently pending

before the court are the defendant's March 15, 2011 Motion to Dismiss, or in the

alternative, for Judgment upon the Administrative Record, and the plaintiff's May 3, 2011 Cross-Motion for Judgment upon the Administrative Record.  The plaintiff, Paul L. Williams, served on active duty between January 1985 and June 1994.  After a brief stint in the Army Reserve, Mr. Williams in January 1996 joined the Army National Guard Unit in Utah.  The Utah National Guard relieved Mr. Williams of his duty in February 2002, but he soon thereafter joined the Army Inactive Reserve.  In January 2005, Mr. Williams was mobilized to serve in Landstuhl, Germany in connection with Operation Iraqi Freedom.  There, Mr. Williams experienced symptoms of severe depression.  After evaluations by one Medical Evaluation Board ("MEB") and three Physical Evaluation Boards ("PEBs"), Mr. Williams was permanently retired from the Army in April 2010 with a thirty percent disability rating.  He now seeks review of that rating, alleging errors committed by the three informal PEBs convened between June 2006 and March 2010 to assess his condition and payment of any wrongfully denied disability pay.  Mr. Williams further claims that he was wrongfully separated from the armed forces and seeks back pay for any period of wrongful discharge.

The government has moved to dismiss Mr. Williams' wrongful discharge claim under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") on the grounds that the court lacks subject-matter jurisdiction over the claim.  Def.'s Mot. to Dismiss, ECF No. 9 ("Def.'s Mot.").  The government has moved to dismiss the remainder of Mr. Williams' claims pursuant to RCFC 12(b)(6) on the grounds that Mr.

Williams has failed to state a claim upon which relief may be granted. The court converted this motion to a motion for summary judgment pursuant to RCFC 12(d) on June 28, 2011. The government has moved in the alternative for judgment upon the administrative record ("AR"). Mr. Williams also seeks judgment on the administrative record. Pl.'s Resp. & Mot. for J., ECF No. 15 ("Pl.'s Resp. & Mot."). For the reasons set forth below, the court finds that Mr. Williams waived his right to challenge his disability rating and military discharge when he concurred with the PEBs' findings and recommendations. Accordingly, the government's motion for summary judgment is **GRANTED**, and the plaintiff's cross-motion for judgment on the record is **DENIED**.

## I.    BACKGROUND

### A.    History of Mr. Williams' Military Service and Retirement[1]

Mr. Williams served as a Chaplain on active duty in the United States Army between January 1985 and June 1994. AR 19. In the late 1980s, while stationed in Japan, he experienced "depressive symptoms," such as "tearfulness, lack of motivation, and unreasonable excessive fear." AR 20 (internal quotation marks omitted). Mr. Williams' symptoms affected his job performance, and in 1993, after being passed over for a promotion, he sought treatment from a military psychiatrist. Id. Mr. Williams was diagnosed with "major depression, probably recurrent," and began to take anti-depressant

---

[1]The facts in this section are taken from the administrative record and are not in dispute.

drugs.  Id.  In June 1994 he "had a mandatory separation because he was passed over [again] for Major."  Id. (internal quotation marks omitted).

Mr. Williams joined the Army Reserve in July 1994.  AR 19.  While in the Army Reserve, Mr. Williams apparently applied for and "received a [Department of Veterans Affairs ("VA")] disability of 10% for depression."  AR 20.  The record reflects that sometime "around the year 2000" his VA disability rating was increased to fifty percent. AR 07, 23.  When Mr. Williams' stint in the Army Reserve ended in 1995 he became "more depressed," increasing his psychotherapy treatment and antidepressant dosages. AR 20.  Mr. Williams moved from Texas to Utah at the end of 1995, and there joined the Army National Guard in January 1996.  Id.  During this period Mr. Williams briefly worked in the private sector as a teacher.  Id.  He claims he was "forced to quit" in late 1997 after an incident in which Mr. Williams alleges that he was "'unjustly accused of saying inappropriate things in class.'"  Id.  Mr. Williams was able to find other private sector employment.  Id.

In February 2002 Mr. Williams was relieved of his Utah National Guard duty.  Id. Mr. Williams reports that a superior officer felt he was "'ineffective with Soldiers, and the Soldiers didn't like [him].'"  AR 19.  Mr. Williams states that he was "'basically fired.'"  AR 20.  At about this time the military initiated an evaluation of Mr. Williams' medical condition.  AR 20.  Mr. Williams' unit "'sat on [his] paperwork,'" however, and before the evaluation could proceed, Mr. Williams was in January 2003 unexpectedly

offered a promotion to Lieutenant Colonel by the Army Inactive Reserve.  AR 20-21.  Mr.

Williams accepted the promotion and joined a Drilling Reserve Unit stationed in Utah.

AR 21.  He states that he informed the unit about his mental health history, but that "'they

wanted [him] anyway.'"  Id.  In January 2005, Mr. Williams was mobilized for active

duty in Landstuhl, Germany in connection with Operation Iraqi Freedom.  AR 01.

Despite his hope that his depression would not interfere with his service in

Germany, AR 21, Mr. Williams experienced serious distress throughout his deployment,

AR 07-08, 21.  He clashed with a supervisor and with at least one coworker, and his

depressive symptoms increased.  AR 21.  On March 25, 2005, Mr. Williams was "in a

state of severe distress" following a conflict with his roommate and sought treatment at

Landstuhl Regional Medical Center.  AR 07.  There Mr. Williams "reported severe

anxiety, anergia, social isolation, anhedonia, recurrent crying spells, profound dysphoria

and a marked sense of worthlessness and helplessness."  AR 07.  In September 2005, in

response to Mr. Williams' continuing depressive symptoms and pursuant to Army

Regulation 635-40, Dr. Walid Nassif, Mr. Williams' treating physician, initiated a MEB.[2]

AR 21.

---

[2]Army Regulation 635-40 governs Physical Evaluation for Retention, Retirement, or
Separation.  MEBs are convened "to document a Soldier's medical status and duty limitations"
that may result from such status.  Army Reg. 635-40 ¶ 4-10.  MEBs are not the final authority on
a servicemember's medical condition, however; rather, MEBs "recommend for referral to a PEB
those Soldiers who do not meet medical retention standards."  Id. at ¶ 4-13.  Further, "[a] rating
is not assigned [to a medical condition or defect] until the PEB determines the Soldier is
physically unfit for duty."  Id. at ¶ 3-5.

Dr. Nassif conducted the first of three MEB evaluations of Mr. Williams on December 19, 2005.  AR 07.  Dr. Nassif found that Mr. Williams suffered from "a severely disabling combination of dysthymia and recurrent major depression that has been treatment-resistant and requiring very high levels of care."  AR 09.  In the portion of the narrative summary concerning Mr. Williams' "Cognitive Mental Status," Dr. Nassif further reported:

> [Cognitive Mental Status] appears normal upon testing.  Notably, short and long-term memory, concentration, attention, orientation, calculations, abstractions, organization and planning were intact.  However during periods of high stress or dysphona it was clear from his report and from co-workers' account that his attention, concentration, short-term memory, organization and planning in the real world were markedly reduced.

AR 08.  In the portion of the narrative summary marked "Patient Interview," Dr. Nassif noted that Mr. Williams was:

> well-groomed and sustains good eye contact.  His speech is of normal rate and volume, somewhat monotone.  Mood is frequently dysphone and anxious.  Affect is generally constricted, frequent tearfulness and intense distress are manifested.  Thought processes are logical and coherent.  Thought content is relevant to his struggles, with no evidence of bizarre or delusional material.  He denies abnormal perceptions.  He is often preoccupied with the futility of his life, but appears to rely on his family and his care providers to shield himself from proceeding into active suicidal thinking.

Id.  Dr. Nassif also noted that Mr. Williams "seemed able to develop a trusting and good working relationship with his treating team, and has been able to adhere to his contract for safety."  Id.  In light of Mr. Williams' psychiatric condition and inability to fulfill his

duties, Dr. Nassif concluded that "[i]n my opinion this service member does not meet retention standards."  AR 09.

Two other doctors' subsequent MEB evaluations of Mr. Williams concurred with Dr. Nassif's report.  AR 11, 24.  In March 2006, Dr. Jonathan Olin reported that Mr. Williams was "a neatly groomed male" and that "[h]e was generally cooperative during the interview process.  He described his mood as depressed.  His speech was fluent and coherent.  His thinking was generally logical and goal directed without evidence of a psychotic thought process.  He indicated he was not experiencing suicidal or homicidal ideation."  AR 11.  Though he echoed Dr. Nassif's diagnosis of Mr. Williams' severe and recurrent major depression, AR 12, Dr. Olin further noted that Mr. Williams was "competent to participate in Medical Evaluation Board proceedings" and was "able to manage his own affairs and finances."  AR 13.

In May 2006, Mr. Williams' commanding officer, Lieutenant Colonel ("LTC") John S. Stevens, submitted a report to the MEB concerning Mr. Williams' performance.  AR 16-18.  LTC Stevens reported that Mr. Williams had complained of symptoms such as "weight control problems, feelings of sadness, discouragement, lack of energy, difficulty concentrating, trouble sleeping and excessive worry with regards to his family's well-being."  AR 16.  LTC Stevens also noted that Mr. Williams had "never described any delusions, panic attacks, hallucinations, suicidal or homicidal thoughts.  He has been able to communicate clearly and displays a professional looking uniform."  Id.  LTC Stevens

concluded that "[t]hrough[]out his career, Chaplain Williams has been capable of performing the duties required of [him].  Unfortunately, I do not feel Chaplain Williams is capable of managing his condition without psychiatric care in close proximity. . . . I recommend finding [him] unfit for duty."  AR 17.

Later that month, Dr. John Wilhite conducted Mr. Williams' final MEB evaluation and similarly concluded that Mr. Williams suffered from "[m]ajor depression, severe, recurrent."  AR 24.  Dr. Wilhite recorded Mr. Williams' symptoms as "tearfulness, lack of motivation, unreasonable excessive fear, and problems with concentration."  AR 22.  Dr. Wilhite further noted that Mr. Williams "denies any current suicidal or homicidal thoughts, plans, or ideations."  Id.  Noting that Mr. Williams' symptoms had interfered with his regular Chaplain's duties, Dr. Wilhite wrote, "[Mr. Williams] reports that his current duties are working part time in which 'I sit at the [Soldier Readiness Processing ("SRP")] site, and I ask about dog tags, and ask if the Soldiers want an appointment to see a Chaplain, and if they have any problems, I refer them to a Chaplain.'"  AR 23.  Finally, Dr. Wilhite officially referred Mr. Williams to the PEB for adjudication of his fitness for duty.[3]  AR 25.

_____

[3]Army regulations provide that "[i]f the MEB determines the Soldier does not meet retention standards, the board will recommend referral of the Soldier to a PEB."  Army Reg. 635-40 ¶ 4-10.  The PEB is a fact-finding board that "evaluate[s] all cases of physical disability equitably for the Soldier and the Army."  Id. at ¶ 4-17(a).  Its purpose is to "investigat[e] the nature, cause, degree of severity, and probable permanency of the disability" and "evaluat[e] the physical condition of the Soldier against the requirements of the Soldier's particular office, grade, rank, or rating."  Id. at ¶ 4-17(a)(1).  The PEB further determines the permanency of the servicemember's disability, and, if the servicemember is otherwise entitled to disability benefits,

Mr. Williams did not agree with Dr. Wilhite's findings, AR 27, and submitted a

statement of objections, AR 28.  Mr. Williams' statement indicated that he felt the official

Narrative Summary submitted by Dr. Wilhite omitted certain side effects of Mr.

Williams' psychiatric condition, including "drowsiness, confusion, impotence, a-pathy

[sic], [and] a loss of any passion about anything."  AR 28.  Mr. Williams also asserted

that the doctor's diagnosis of his "problems with concentration" should have been

modified to read "problems with concentration, memory, discernment, dissociation,

despair."  Id.  Mr. Williams concluded his appeal with the statement, "My mind is not

clear about what of this information is important to your evaluation, but these are the facts

which seemed incomplete in the file."  AR 29.

Mr. Williams' first informal PEB convened in June 2006.[4]  The board found that

Mr. Williams' "[m]ajor depression" rendered him physically unfit, recommended a

disability rating of thirty percent,[5] and placed Mr. Williams on the Temporary Disability

_____

the percent rating reflecting the severity of the disability at the time of the assessment.  Id. at ¶ 4-19.  This percentage determines the amount of disability compensation that a servicemember will receive.  See 10 U.S.C. § 1201.

[4]Army regulations provide that "[e]ach case is first considered by an informal PEB."  Army Reg. 635-40 ¶ 4-20(a).

[5]The sum of the parties' briefings evince their agreement that the PEBs convened to evaluate Mr. Williams' disability were bound by Army regulations to use the schedule set out in the Veterans Affairs Schedule for Rating Disabilities ("VASRD").  Pl.'s Resp. & Mot. 26-28; Def.'s Mot. 24.  The current VASRD for mental disorders comprises ten different ratings.  38 C.F.R. § 4.130.  A thirty percent rating, with which Mr. Williams argues the PEBs erroneously diagnosed him, is described as:

Occupational and social impairment with occasional decrease in work efficiency and

Retired List ("TDRL").[6]  AR 32.  Mr. Williams' symptoms, as described by the board,

included "profound dysphoria, chronic anxiety, feeling of hopelessness, helplessness, loss

of confidence, anhedonia, frequent crying spells and inability to effectively perform

Chaplain's duties."  Id.  The PEB noted that Mr. Williams had "been relieved of

Chaplain's duties, [and is] now functioning as a screener at the Post's SRP site."  Id.

---

> intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events)[.]

Id.  A seventy percent rating, with which Mr. Williams argues the PEBs should have diagnosed him, is described as:

> Occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); inability to establish and maintain effective relationships[.]

Id.

[6]A servicemember with twenty or more years of service found unfit at a rating of thirty percent or higher due to a disability the PEB determines is temporary or unstable is placed on the TDRL.  Army Reg. 635-40 ¶¶ 3-9, 7-2.  A servicemember is removed from the TDRL and placed on the Permanent Disability Retired List ("PDRL") when a PEB determines that his or her disability has become permanent, or at the end of 5 years on the TDRL.  Id. at ¶ 7-9.

Despite his thirty percent disability rating, Mr. Williams, pursuant to Army regulations,

received fifty percent of his monthly retired pay base during his time on the TDRL.[7]

The findings and conclusions of Mr. Williams' first PEB were represented on a

DA Form 199 dated June 2, 2006.[8]  Id.  Block 13, the portion of that form marked

"ELECTION OF SOLDIER," stated: "I HAVE BEEN ADVISED OF THE FINDINGS

AND RECOMMENDATIONS OF THE PHYSICAL EVALUATION BOARD, AND

HAVE RECEIVED A FULL EXPLANATION OF THE RESULTS OF THE FINDINGS

AND RECOMMENDATIONS AND LEGAL RIGHTS PERTAINING THERETO . . . ."

AR 34 (emphasis added).  Beneath this statement, Mr. Williams initialed next to a line

stating, "I CONCUR AND WAIVE A FORMAL HEARING OF MY CASE."  Id.

_____

[7]See Army Reg. 635-40 ¶ C-10(b)(2) ("For those Soldiers [placed on the TDRL] who first entered active duty after 7 September 1980, the minimum payment is 50 percent of the monthly retired pay base.").

[8]Following an informal PEB evaluation, a servicemember completes Block 13 of DA Form 199, which lists the election options available to the servicemember:

> (a) Concurrence with the findings and recommendations and waiver of a formal hearing.
> (b) Nonconcurrence with the findings and recommendations; submission of a rebuttal explaining the Soldier's reasons for nonconcurrence; and waiver of a formal hearing.
> (c) Demand for a formal hearing with or without a personal appearance.
> (d) Choice of counsel if a hearing is demanded.

Army Reg. 635-40 ¶ 4-20(c)(1).  Upon the servicemember's receipt of the informal PEB's findings, it is the responsibility of the Physical Evaluation Board Liaison Officer ("PEBLO") to counsel the servicemember regarding these options.  The PEBLO then completes DA Form 5893-R, indicating that such counseling has in fact occurred.  Id. at ¶ 4-20(d)(1).  Mr. Williams' PEBLO Counseling Checklist/Statement appears in the administrative record and, as initialed by Mr. Williams, indicates that his PEBLO counseled him appropriately throughout both the MEB and PEB proceedings.  AR 30-31.

(emphasis added).  Mr. Williams added his full signature at the bottom of the form.  Id.

Finally, Mr. Williams' PEBLO signed immediately beneath a statement reading, "I have

informed the soldier of the findings and recommendations of the Physical Evaluation

Board and explained to him/her the result of the findings and recommendations and

his/her legal rights pertaining thereto.  The soldier has made the election(s) shown

above."  Id. (emphasis added).  Mr. Williams also signed his Certificate Of Release Or

Discharge From Active Duty, indicating his placement on the TDRL.  AR 35.

     Dr. Gerald Bissell conducted Mr. Williams' first TDRL evaluation in November

2007.[9]  AR 36.  Dr. Bissell noted that Mr. Williams:

> continues to have severe signs and symptoms of Major Depression.  He has a
> depressed mood every day.  He has markedly diminished interest or pleasure
> in all of his activities.  He has a weight gain of more tha[n] five percent in the
> last year.  He has insomnia every day.  He has anhedonia.  He has feelings of
> worthlessness every day.  He has a diminished ability to concentrate and think.
> He has recurrent thoughts of death [but] he does not have suicidal ideation.
> These symptoms have caused clinically significant distress and impairment in
> social and occupational areas of functioning.

Id.  Dr. Bissell found Mr. Williams' symptoms and Beck Depression Inventory score

"indicative of a chronic clinically very significant depression that has not changed in the

last eighteen months."  Id.  Dr. Bissell noted that Mr. Williams had "for the last seven

months . . . been employed by the State of Utah," but that "[h]e was counseled within the

last week that he may be terminated because of his difficulty with learning new tasks,

---

[9]A servicemember placed on the TRDL "must undergo a periodic medical examination
and PEB evaluation at least once every 18 months to decide whether a change has occurred in the
disability for which the Soldier was temporarily retired."  Army Reg. 635-40 ¶ 7-4.

organizing and thinking." Id.  The portion of Dr. Bissell's report marked, "MENTAL STATUS EXAM," noted that Mr. Williams was "fully oriented, alert and cooperative. Mood was dysphoric.  His affect was restricted. . . . The patient denied homicidal/suicidal ideation.  There were no abnormalities of thought contents or processes.  Thoughts were coherent, organized and goal directed."  AR 37.  Dr. Bissell also noted, however, after discussing Mr. Williams' numerous symptoms, that Mr. Williams "meets full diagnostic criteria for both [major depression and post traumatic stress disorder ("PTSD")]" and that his "condition is felt to be stable and it is recommended that his retirement be finalized and that he be taken off of TDRL status."  Id.  Dr. Bissell concluded his report by indicating that Mr. Williams "does have the mental capacity to understand and participate in administrative proceedings."  Id.  Mr. Williams signed a letter dated November 15, 2007 concurring with Dr. Bissell's findings and recommendation.  AR 40.

Mr. Williams' second informal PEB convened in late November 2007.  AR 41. The board again cited Mr. Williams' exhibition of "severe depressive symptoms which has resulted in his termination from one job and resulted in his current position at the VA being in doubt."  Id.  The board concluded that Mr. Williams' condition remained unstable, and thus retained him on the TDRL.  Id.  The board made no mention of Dr. Bissell's PTSD diagnosis.  Id.  In a letter dated November 28, 2007, the informal PEB informed Mr. Williams that because it had neither changed his disability rating nor removed him from the TDRL, "no appeal of [those] proceedings [was] authorized."  AR

13

43.  Thus Mr. Williams' second PEB retained him on the TDRL and declined to modify

his thirty percent disability rating.  AR 41.  Mr. Williams continued to receive fifty

percent of his monthly retired pay base.  See Army Reg. 635-40 ¶ C-10(b)(2).

     Mr. Williams' next TDRL evaluation occurred in February 2010.[10]  AR 44-52.  Dr.

Richard Bibb noted Mr. Williams' "chronic (unremitting) depressive process dating back

to the early 1990s," citing many of the symptoms Mr. Williams' past doctors had

observed.  AR 48.  These included Mr. Williams' "very narrow range of social

functioning," his distress at "any type of interpersonal conflict or misunderstanding," and

his fear that his "emotional and cognitive problems (lack of concentration) may

eventually force him to be terminated from [his] job."  Id.  Dr. Bibb noted that there had

been "no indication of a psychotic element in [Mr. Williams'] emotional condition, and

[Mr. Williams] vehemently denies past or present suicidal thinking."  AR 45.  Dr. Bibb

further reported that Mr. Williams "was able to give an adequate chronological account of

milestone events in his TDRL history.  [Mr. Williams'] recent and remote memory

functioning appeared to be adequate, though no formal memory testing was conducted.

[Mr. Williams] was not hallucinatory or delusional."  AR 46.  In the section of his

summary marked, "Mental Competency," Dr. Bibb wrote, "This Service Member is felt to

be currently competent to participate in MEB/PEB administrative process and to manage

---

[10]Though Mr. Williams' November 2007 PEB ordered that he undergo a TDRL
reexamination during June 2009, AR 42, it is unclear from the record both whether such an
examination actually occurred and why it may not have.  Mr. Williams' claims are related to only
his 2006, 2007, and 2010 PEB evaluations.

his own financial affairs." AR 48.  Once again, Mr. Williams concurred with the findings

and recommendations resulting from his TDRL examination.  AR 54.  Dr. Leann

Nitschke, who performed a corresponding physical examination on the same day as Dr.

Bibb's evaluation, found Mr. Williams' "mood and affect slightly somber but congruent

and appropriate; good eye contact; speech normal rate, volume and rhythm; functional

memory good; thought processes logical, linear and goal directed[.]"  AR 51.

Mr. Williams' final informal PEB convened in March 2010.  The board found that

Mr. Williams' symptoms included "being constantly anxious, recurrent panic episodes,

irritability, lack of confidence in himself and avoiding crowds. . . . He is working full

time for the state of Utah . . . however, he states he has great difficulties completing the

paperwork requirements of the job and is in fear of being let go."  AR 55.  Using the

VASRD, the board rated Mr. Williams' disability at thirty percent "for occasional

decrease in work efficiency and intermittent periods of inability to perform occupational

tasks due to depressed mood, anxiety and sleep impairment."  Id.  The board further

advised Mr. Williams that "[u]pon re-evaluation, although some change in your medical

condition may be anticipated, for the purpose of adjudicating your disability

compensation, your condition is considered to have stabilized at a degree of severity that

is equal to or greater than 30 percent, as indicated above."  Id.  The PEB thus

recommended Mr. Williams' permanent retirement.  Id.  As he had following his initial

informal PEB, Mr. Williams completed the section of DA Form 199 marked

"ELECTION OF SOLDIER," and again concurred with the PEB's findings and recommendation and waived a formal PEB hearing of his case. AR 57. Mr. Williams appears to have first checked the space on the form reserved for concurrence with a finding of "fitness for duty." He apparently realized his mistake, as on the form there is an arrow and then a check in the space reserved for "concurrence" and "waiving formal proceedings." Id.

On April 1, 2010, Mr. Williams was permanently retired from the Army with a thirty percent disability rating.[11]   AR 59-60.

### B.    History of the Proceedings

Mr. Williams filed the present action on October 25, 2010, seeking payment of any wrongfully denied disability pay and reinstatement and back pay for any period of wrongful discharge. Compl. 14. Mr. Williams alleges that each PEB convened to evaluate his case improperly failed to rate his disability at (at least) seventy percent, Compl. ¶¶ 27, 30, 33; that the 2006 and 2007 PEBs improperly failed to place him in permanent retirement rather than on the TDRL, Compl. ¶¶ 28, 31; and that the collective

---

[11]At argument, counsel for Mr. Williams stated without objection that the VA has now given Mr. Williams a 100% disability rating because of his employability-related issues. According to counsel for the plaintiff, Mr. Williams receives payments from the VA ($2823 monthly), and the Social Security Administration ($1775 monthly), totaling $4214 monthly after $384 in deductions for his Department of Defense Survivor Benefit Plan and State of Utah health insurance. Notice of Payments Received, ECF No. 24. Mr. Williams does not receive payments from either the State of Utah or the Department of Defense; his disability benefits from the State of Utah are offset due to his higher payments from the Social Security Administration; his Department of Defense retirement pay is offset due to his higher payments from the VA. Id.

failures of the PEBs to properly adjudicate his case amounted to wrongful discharge from the armed forces by denying him the "full and fair hearing" to which he is statutorily entitled, Compl. ¶¶ 35-36; see also 10 U.S.C. § 1214; 37 U.S.C. § 204.

The government has moved to dismiss Mr. Williams' claims pursuant to RCFC 12(b)(1) and RCFC 12(b)(6) and has moved in the alternative for judgment upon the administrative record pursuant to RCFC 52.1.  The government argues that this court lacks subject-matter jurisdiction over Mr. Williams' claim for reinstatement and back pay, that Mr. Williams has failed to state any claim upon which relief can be granted, and that, even if Mr. Williams has justiciable claims, the government is entitled to judgment upon the administrative record.  Mr. Williams has cross-moved for judgment upon the administrative record.  Both parties have, in support of their respective motions, presented materials outside the pleadings.  Thus, on June 28, 2011, the court by notice informed the parties of its obligation, pursuant to RCFC 12(d), to treat the government's Motion to Dismiss as one for summary judgment under RCFC 56.[12]  The court held oral argument on the pending motions on July 29, 2011.  The court will first address its authority to consider Mr. Williams' wrongful discharge claim, followed by the government's motion to dismiss his remaining claims.

---

[12]See Notice Regarding Court's Treatment of Motion under RCFC 12(b)(6) as Motion for Summary Judgment, ECF No. 21.

II.     **DISCUSSION**

A.      **Jurisdiction Over Mr. Williams' Wrongful Discharge Claim**

1.      **Standard of review**

The standard for ruling on a motion to dismiss for lack of subject-matter jurisdiction pursuant to RCFC 12(b)(1) is well-settled.  The plaintiff bears the burden of establishing subject-matter jurisdiction.  Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing McNutt v. Gen. Motors, 298 U.S. 178, 189 (1936)), and must do so by a preponderance of the evidence, Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).  Because jurisdiction is a threshold matter, a case can proceed no further if a court lacks jurisdiction to hear it.  See Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) ("[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety." (citation omitted)); Steel Co. v. Citizens for a Better Env't, 523 U.S. 83 (1998).  See generally John R. Sand & Gravel v. United States, 552 U.S. 130 (2008).

When a party has moved to dismiss for lack of subject-matter jurisdiction, the alleged facts in the complaint are viewed as true.  Pixton v. B & B Plastics, Inc., 291 F.3d 1324, 1326 (Fed. Cir. 2002) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)); see also N. Hartland, L.L.C. v. United States, 309 F. App'x 389, 392 (Fed. Cir. 2009) (the court "takes the allegations in the pleadings as true and construes them in the light most favorable to the complainant").  When a court considers a motion to dismiss for lack of

18

subject-matter jurisdiction, it may look beyond the pleadings and "inquire into jurisdictional facts" to determine whether jurisdiction exists.  Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991).

### 2.    The court has subject-matter jurisdiction over Mr. Williams' wrongful discharge claim.

The United States initially moved to dismiss Mr. Williams' wrongful discharge claim under RCFC 12(b)(1) for lack of subject-matter jurisdiction.  Def.'s Mot. 1.  The United States Court of Federal Claims may, pursuant to the Tucker Act, exercise jurisdiction over claims "against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  A plaintiff must, however, identify a source of a substantive right to compensation (a "money-mandating" source) independent of the Tucker Act in order to invoke the court's jurisdiction.  In re United States, 463 F.3d 1328, 1333-34 (Fed. Cir. 2006) ("[A] Tucker Act plaintiff must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States.") (citing Todd v. United States, 386 F.3d 1091, 1094 (Fed. Cir. 2004)).  The Military Pay Act, 37 U.S.C. § 204(a) (2006), under which Mr. Williams brings his wrongful discharge claim, is "well established [as] a money-mandating statute." Smith v. Secretary of Army, 384 F.3d 1288,

1294 (Fed. Cir. 2004) (citing <u>Dysart v. United States</u>, 369 F.3d 1303, 1315 (Fed. Cir. 2004)).

The government contends that if Mr. Williams retired voluntarily he is not eligible to bring his claim in this court.  Def.'s Mot. 10.  By reference to <u>Sammt v. United States</u>, 780 F.2d 31 (Fed. Cir. 1985), in which the United States Court of Appeals for the Federal Circuit found this court to be without jurisdiction to consider the claim of a servicemember who had retired voluntarily, and <u>Poole v. United States</u>, 64 Fed. Cl. 776 (2005), in which this court dismissed a claim for improper discharge because the plaintiff acknowledged he had been properly retired, the government appears to urge that such voluntary retirement precludes Mr. Williams from relying on the Military Pay Act as the source of a substantive right to compensation, and thus prevents this court from exercising jurisdiction over his claim.  Mr. Williams argues that voluntary retirement is not a jurisdictional bar and in any event disputes the voluntariness of his retirement.  Pl.'s Resp. & Mot. 11.

Setting to one side the voluntariness of Mr. Williams' discharge from the military, the court finds, and at argument the government agreed, that the government's threshold jurisdictional argument is inconsistent with the recent law of this Circuit.  Prior to the Federal Circuit's decision in <u>Fisher v. United States</u>, 402 F.3d 1167 (Fed. Cir. 2005) (en banc), plaintiffs attempting to invoke this court's jurisdiction over wrongful discharge claims failed where they had retired voluntarily from the military.  <u>See, e.g.</u>, <u>Sammt</u>, 780

20

F.2d at 33; <u>Adkins v. United States</u>, 68 F.3d 1317, 1321 (Fed. Cir. 1995) ("If . . .

[plaintiff's] retirement was 'voluntary,' he retained no statutory entitlement to

compensation, and thus no money-mandating provision would support Tucker Act

jurisdiction over his claim.").

In <u>Fisher</u>, however, the Federal Circuit, seeking to address the "confusion

concerning the jurisdiction of the courts to hear and decide Tucker Act claims and the

relationship of the jurisdictional issue to the Tucker Act's requirement for a money-

mandating source," 402 F.3d at 1184,[13] explained:

> When a complaint is filed alleging a Tucker Act claim based on a
> Constitutional provision, statute, or regulation, <u>see</u> 28 U.S.C. § 1491(a)(1), the
> trial court at the outset shall determine, either in response to a motion by the
> Government or sua sponte . . . whether the Constitutional provision, statute, or
> regulation is one that is money-mandating.
> If the court's conclusion is that the Constitutional provision, statute, or
> regulation meets the money-mandating test, the court shall declare that it has
> jurisdiction over the cause, and shall then proceed with the case in the normal
> course.
> . . . .
> . . . Assuming that the Court of Federal Claims has taken jurisdiction over the
> cause as a result of the initial determination that plaintiff's cause rests on a
> money-mandating source, the consequence of a ruling by the court on the
> merits, that plaintiff's case does not fit within the scope of the source, is
> simply this: plaintiff loses on the merits for failing to state a claim on which
> relief can be granted.

---

[13]Dismissal of military pay claims for lack of subject-matter jurisdiction did not enjoy
universal acceptance even prior to <u>Fisher</u>.  <u>See</u> <u>Hoskins v. United States</u>, 61 Fed. Cl. 209, 217
(2004) (noting "decisions in this circuit which question the propriety of dismissing military pay
claims on jurisdictional grounds") (citing <u>Moyer v. United States</u>, 190 F.3d 1314, 1321 n.3 (Fed.
Cir. 1999); <u>Reeves v. United States</u>, 49 Fed. Cl. 560, 565 (2001); <u>Palmer v. United States</u>, 168
F.3d 1310, 1313 (Fed. Cir. 1999)).

Fisher, 402 F.3d at 1173, 1175-76.  Though Fisher did not concern the Military

Pay Act, the Federal Circuit's subsequent decision in Metz v. United States, 466 F.3d 991

(Fed. Cir. 2006), relied on Fisher in support of its holding that the lone jurisdictional

hurdle a plaintiff claiming wrongful discharge in this court must overcome is satisfied by

grounding that claim in the Military Pay Act, regardless of the voluntariness of the

plaintiff's discharge or retirement:

> Fisher clearly states that the determination of whether a plaintiff's case fits
> within the scope of the source is properly raised under Fed.R.Civ.P. 12(b)(6),
> rather than Rule 12(b)(1).  It thus compels the conclusion that the issue of the
> voluntariness of a plaintiff's separation, a necessary requirement for a
> separated-plaintiff's case to fit within the scope of 37 U.S.C. § 204, is properly
> addressed under a Rule 12(b)(6) motion to dismiss and therefore is no longer
> a jurisdictional requirement appropriately challenged under Rule 12(b)(1). . .
> .
>
> Accordingly, we conclude that the issue of the voluntariness of a
> plaintiff's discharge is not jurisdictional; rather, is it a question that should be
> considered in the context of the merits of a plaintiff's case in determining
> whether a plaintiff can take advantage of § 204's money-mandating status.

Metz, 466 F.3d at 998 (emphasis added) (internal citations omitted).  At oral argument,

the government acknowledged the current state of the law and agreed, based on the

Federal Circuit's recent decisions in Fisher and Metz, that voluntariness of a

servicemember's discharge is not a jurisdictional matter.  As such, Mr. Williams'

wrongful discharge claim will not be dismissed for lack of jurisdiction based on the

voluntariness of his discharge.

### B.       Waiver and Justiciability of Claims[14]

#### 1.       Mr. Williams waived judicial review of his thirty percent disability rating by agreeing to accept the conclusions of the informal PEBs.

The United States urges the court to dispose of Mr. Williams' disability rating claims on the theory that his waivers of formal hearings after his informal PEB proceedings, AR 34, 57, constitute like waivers of review of those proceedings in this court. Def.'s Mot. 16-18.  The government further argues that Mr. Williams waived his right to formal PEB hearings voluntarily, id. at 17-23, and that in any event he has not offered evidence sufficient to overcome the presumption of voluntariness typically afforded to such waivers, id. at 18-19.  In support of its argument the government directs the court's attention to Gant v. United States, 63 Fed. Cl. 311 (2004), aff'd, 417 F.3d 1328 (Fed. Cir. 2005), wherein this court held that a former servicemember's waiver of formal PEB proceedings "prevented the [agency] from itself having an opportunity to entertain any claim or objection and to develop a full record that this court now could

_____

[14]As previously noted, the court will consider the government's RCFC 12(b)(6) motion to dismiss Mr. Williams' claims as one for summary judgment under RCFC 56.  See Gant v. United States, 63 Fed. Cl. 311, 314 (2004) (treating the government's RCFC 12(b)(6) motion as one seeking summary judgment), aff'd, 417 F.3d 1328 (Fed. Cir. 2005).  A summary judgment inquiry, however, is distinct from the matter of judgment upon the administrative record.  See id. 63 Fed. Cl. at 318 (examining the administrative record but declining to reach the merits where plaintiff waived judicial review), aff'd, 417 F.3d at 1332.  Though the court refers to the administrative record in this section, it does so only to determine the justiciability of Mr. Williams' respective claims, which the government has challenged.  See Def.'s Mot. 16.  Only if the court determines that Mr. Williams' claims are justiciable may it proceed to consideration of the parties' cross-motions for judgment upon the administrative record.

review." <u>Gant</u>, 63 Fed. Cl. at 318 ("The Navy effectively was deprived of the opportunity

to correct its own errors-if they ever existed.  Agencies must have these opportunities.").

Thus, because "[a]llowing plaintiff to maintain a claim after waiving it earlier would

render the waiver meaningless," the court determined that the plaintiff had indeed waived

judicial review absent a showing that such waiver was involuntary.  <u>Id.</u> ("The only way

plaintiff could void his waiver and maintain a claim before the court would be to show

that his act of signing the waiver was involuntary.").  The court in <u>Gant</u> found that

plaintiff's waiver voluntary and awarded summary judgment to the defendant.  <u>Id.</u> at 319.

The government argues that the facts of <u>Gant</u> are substantially similar to those at issue

here, and hence that Mr. Williams' request for judicial review of informal PEB

proceedings cannot survive his waivers of the formal PEB hearings to which he was

entitled.

  Mr. Williams responds that his waivers of formal hearings after the 2006 and 2009

informal PEB proceedings were involuntary, and thus void, due both to his medical

condition, Compl. ¶¶ 16, 23, and to the Army's misrepresentations, Pl.'s Resp. & Mot.

19-20.  Mr. Williams further argues that any voluntary waiver was nevertheless limited in

scope, precluding by its terms a formal PEB hearing but not review in this court of his

disability rating.  Pl.'s Resp. & Mot. 20.  Mr. Williams relies primarily on <u>Poole</u>, wherein

this court found that a mentally disabled servicemember's waiver of an administrative

hearing did not bar judicial review of his disability rating.  <u>See Poole</u>, 64 Fed. Cl. at 781.

24

Mr. Williams further relies on Gant to establish that a waiver induced by misrepresentation may be involuntary and thus may not operate to bar further review.  See Gant, 63 Fed. Cl. at 319 ("An act induced by misrepresentation can render that act involuntary. . . . A misrepresentation 'can be caused by providing misleading information or by failing to provide relevant information.  Information is considered misleading if a reasonable person would have been misled by the representation.'" (quoting Tippett v. United States, 185 F.3d 1250, 1255 (Fed. Cir. 1999))).  Finally, Mr. Williams relies on Van Cleave v. United States, 402 F.3d 1341 (Fed. Cir. 2005), in which the Federal Circuit, despite finding that a servicemember's waiver of formal PEB proceedings was voluntary, remanded the case to this court to determine whether the waiver precluded judicial, as well as further administrative, review.  Id. at 1344-45 ("[B]efore dismissing the case . . . it is necessary to know the scope of the waiver–did it include a bar to further administrative review and a bar to any judicial review?").  Mr. Williams argues, in sum, that the waivers at issue were involuntary and in any event do not preclude review of informal PEB proceedings in this court.  The court will address each of Mr. Williams' waiver arguments–voluntariness (including Mr. Williams' disability and the Army's alleged misrepresentations) and scope–in turn.

### a. Mr. Williams' waivers were voluntary.

### i. Mr. Williams' depression did not render his waivers involuntary.

The court agrees with the government that the undisputed facts establish that Mr. Williams' depression was not sufficient to interfere with his ability to fully appreciate the import of his concurrences in the thirty percent disability rating recommendation and his waivers of formal PEBs. Overcoming the "presumption that a person who chooses not to pursue an administrative objection has waived any objection" by reason of mental incompetence requires "evidence that the person failed to fully appreciate the situation due to a mental condition." Poole, 64 Fed. Cl. at 781.

Mr. Williams has failed to present evidence that could lead the court to conclude that he "failed to fully appreciate the situation due to a mental condition," id., and that his waivers were thus involuntary. The government correctly notes that conclusory assertions of involuntariness do not suffice to nullify a waiver. See Gant, 417 F.3d at 1331 ("[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986))). The "evidence" Mr. Williams has provided includes the front pages of three letters sent to him by, respectively, Utah Retirement Systems, the VA, and the Social Security Administration. Pl.'s Resp. & Mot. Ex. 2. On the front page of its February 25, 2011 letter to Mr. Williams, Utah Retirement Systems approves his Long-Term Disability benefits, describes in detail the calculation of the benefits, and explains that the benefits become

26

effective January 1, 2011, in addition to addressing several other administrative matters

connected to Mr. Williams' collection of benefits.  Id.  The portion of the letter Mr.

Williams has provided makes no mention of the nature or degree of Mr. Williams'

disability on or around the date of any of his concurrences and waivers of formal PEB

hearings.  Id.  The VA's February 24, 2011 letter to Mr. Williams informs him that the

department has "made a decision on [Mr. Williams'] claim for an increase in [his] service

connected compensation."  Id.  The letter informs Mr. Williams of his Monthly

Entitlement Amount, his Payment Start Date, and in a box marked, "Reason For Change,"

notes "Compensation Rating Adjustment, Individual Unemployability Adjustment[.]"  Id.

The portion of the letter Mr. Williams has provided makes no mention of the nature or

degree of his disability on or around the date of any of his concurrences and waivers of

formal PEB hearings.  Id.  The Social Security Administration's undated letter to Mr.

Williams informs him that he is "entitled to monthly disability benefits beginning March

2011."  Id.  The letter instructs Mr. Williams as to "What [the Social Security

Administration] Will Pay And When," and includes "Information About Representative's

Fees."  Id.  Once again, the portion of the letter Mr. Williams has provided makes no

mention of the nature or degree of his disability on or around the date of any of his

concurrences and waivers of formal PEB hearings.  Id.

        These documents deal primarily with disbursement of Mr. Williams' disability

benefits.  While the letters are evidence that Mr. Williams suffers from a disability, the

portions that Mr. Williams has introduced neither establish nor even suggest that his depression rendered him incapable of concurring in the findings and recommendations of either of the two informal PEBs that immediately preceded his waivers of formal hearings.  Mr. Williams has not presented any expert medical evidence to support his assertion that he was so disabled at the times the informal PEBs rated his disability that he could not make meaningful elections to concur in these ratings and waive formal PEB hearings.

In contrast, the record supports the government's contention that Mr. Williams was mentally capable of understanding the PEB process, concurring in the PEBs' findings and disability ratings, and waiving his right to contest those ratings before formal PEBs.  As set forth in the undisputed facts, Mr. Williams' military doctors repeatedly determined that he was capable of understanding and participating in the administrative processes set in motion by his disability.  Though Mr. Williams relies on various statements made in the Narrative Summary issued by Dr. Nassif following Mr. Williams' first MEB evaluation, the summary notes that Mr. Williams' "thought processes are logical and coherent" with "no evidence of bizarre or delusional material.  He denies abnormal perceptions."  AR 08.  Dr. Nassif further concluded that Mr. Williams' cognitive mental status was "normal" and that Mr. Williams' "short and long-term memory, concentration, attention, orientation, calculations, abstractions, organization and planning were intact." Id.  Similarly, Dr. Olin's MEB consultation revealed that Mr. Williams' speech was

"fluent and coherent" and that "[h]is thinking was generally logical and goal directed without evidence of a psychotic thought process." AR 11. Dr. Olin concluded that Mr. Williams was "competent to participate in [MEB] proceedings" and could be trusted to "manage his own affairs and finances."[15] AR 13. In November 2007, Dr. Bissell found Mr. Williams to be "fully oriented, alert and cooperative" and found Mr. Williams' thoughts to be "coherent, organized and goal directed" with "no abnormalities of thought contents or processes." AR 37. Dr. Bissell further noted that "[Mr. Williams] does have the mental capacity to understand and participate in administrative proceedings." Id. Finally, as late as February 2010—less than one month prior to his second waiver of formal PEB proceedings—Dr. Bibb reported that there had been "no indication of a psychotic element in [Mr. Williams'] emotional condition," AR 45; found Mr. Williams "competent to participate in MEB/PEB administrative process and to manage his own financial affairs," AR 48; and concluded that Mr. Williams "was not hallucinatory or delusional," AR 46. On the same day, Dr. Nitschke's examination led her to conclude that Mr. Williams' "thought processes [were] logical, linear and goal directed[.]" AR 51. These are not descriptions of an individual who would have been unable to comprehend

---

[15]Mr. Williams' commanding officer, LTC John S. Stevens, though not a doctor, also observed at or around this time that Mr. Williams "ha[d] never described any delusions, panic attacks, hallucinations, suicidal or homicidal thoughts. He has been able to communicate clearly." AR 16.

the straightforward language of DA Form 199.[16]  In sum, the court finds that Mr.

Williams has not presented evidence sufficient to establish that his mental state rendered

involuntary his concurrences in the informal PEBs' conclusions and his waivers of formal

PEB hearings.[17]

> **ii.    Mr. Williams' waivers were not involuntary due to misrepresentation.**

The court further agrees that Mr. Williams' waivers of formal PEB hearings were

not rendered involuntary by any failure by Mr. Williams' PEBLO to explicitly inform him

that waiving formal PEB hearings would also waive review of his disability rating in this

court.  Mr. Williams invokes Gant's caution that a servicemember's waiver of

administrative process, like the voluntariness of a servicemember's retirement, may be

nullified if brought about by omission of relevant information.  See Gant, 63 Fed. Cl. at

319.  However, the central logic of Gant–affirmed by the Federal Circuit–remains that

---

[16]The court does not consider Mr. Williams' erroneous marking of DA Form 199, AR 57, which he himself corrected, to be evidence of involuntary concurrence or nonconcurrence with the findings and recommendations of the 2010 PEB.  Both lines upon which Mr. Williams initialed expressed concurrence with those findings and recommendations; Mr. Williams merely concurred on the incorrect line before realizing his mistake and expressing his concurrence properly.

[17]In view of the foregoing, Mr. Williams' reliance on Poole is misplaced.  That decision does not stand for the broad proposition that waiver of a formal PEB hearing is involuntary so long as the plaintiff merely establishes some general mental disability and alleges involuntariness.  Rather, a servicemember must produce evidence sufficient to establish that his or her mental disability in fact caused a failure to appreciate the administrative processes at issue. In Poole, that evidence consisted of a medical evaluation establishing that the plaintiff suffered from a "delusional disorder" that required hospitalizations; the court found that evidence was sufficient to demonstrate that his waiver was involuntary.  Poole, 64 Fed. Cl. at 778-81.

"[a]llowing plaintiff to maintain a claim after waiving it earlier would render the waiver meaningless."  Id. at 318.  That court further held, "[Plaintiff] was given an opportunity to contest [his] disability rating, and he declined it.  On these facts this court finds that he waived review."  Id. at 318.

In this case, Mr. Williams does not allege that his PEBLO failed to inform him of his right to contest his disability rating before a formal PEB, only that the PEBLO failed to specify that any waiver of review by a formal PEB would also apply to review in this court.  Mr. Williams also does not allege that the PEBLO failed to explain that he did not have to concur in the informal PEBs' disability ratings.  Finally, Mr. Williams has not presented any evidence to suggest that the PEBLO otherwise misled him regarding his rights.  In such circumstances, the court rejects Mr. Williams' contention that his concurrences and waivers of formal PEB hearings were not voluntary because the PEBLO failed to inform him that concurring in his thirty percent disability rating and waiving further review would also preclude judicial review.

### b.     Mr. Williams' waivers reach judicial review of his disability rating.

The court also agrees with the government that the scope of Mr. Williams' waivers encompass judicial review of his disability rating.  Mr. Williams contends, based on Van Cleave, that his waivers precluded only formal PEB hearings, and not review of his disability rating in this court.  This contention is at odds with the conclusion reached by this court and affirmed by the Federal Circuit in Gant.  In that case, the plaintiff, after

findings by an informal PEB, initialed a form stating that he "accept[ed] the findings

[and] waive[d] [his] right to a formal hearing." Gant, 63 Fed. Cl. at 312-13.  The court

found that this waiver (if effected voluntarily) precluded judicial review of the informal

PEB's findings.  Id. at 318.

      The Federal Circuit affirmed this court's holding regarding the scope of the Gant

plaintiff's waiver, rejecting the plaintiff-appellant's reliance on Van Cleave and

clarifying:

> In this case, unlike in Van Cleave, the trial court specifically addressed
> the scope and voluntariness of Mr. Gant's waiver, which was precisely the
> question the Van Cleave court directed the trial court to address on remand.
> Focusing on the facts relating to Mr. Gant's waiver, the trial court concluded
> that Mr. Gant had expressly accepted, and thus waived his right to contest, the
> informal PEB's . . . finding and . . . disability rating.  The court held that once
> Mr. Gant had accepted those findings he was not free to challenge them
> administratively or in court unless he could establish that his waiver was
> unknowing or involuntary.  As to that issue, the court held that Mr. Gant had
> not pleaded any facts or offered any evidence to support his claim that his
> waiver was unknowing or involuntary.

Gant, 417 F.3d at 1331.  The Federal Circuit went on to conclude that the decision in Van

Cleave remanding to the trial court to address the scope of the waiver of formal PEB

hearings "does not require that we reverse or remand in this case for further analysis of

the waiver issue." Id. at 1330.  In this case, Mr. Williams twice signed DA Form 199 and

marked the line indicating that he concurred with the findings and recommendations of

the PEBs regarding the thirty percent disability ratings and waived formal PEB hearings.

AR 34, 57.  The concurrences and waivers indicated by the lines Mr. Williams marked are

32

certainly as clear as the concurrence and waiver at issue in <u>Gant</u>.  Having voluntarily

accepted his thirty percent disability ratings by concurring with the informal PEBs'

determinations and waiving his right to formal PEB hearings, Mr. Williams agreed to be

bound by the informal PEBs' decisions.[18]

The court concludes that Mr. Williams' concurrences and waivers were made

voluntarily and that the waivers extend to judicial review of his disability rating.  Thus,

Mr. Williams may not challenge that rating in this court.[19]

─────────────────────

[18]The plaintiff contends that the government's argument is inconsistent with the Federal Circuit's holding in <u>Martinez v. United States</u>, 333 F.3d 1295, 1304 (Fed. Cir. 2003), which makes clear that a servicemember is not required to exhaust administrative remedies before a military board of corrections before seeking judicial review.  This reliance on <u>Martinez</u> is misplaced.  <u>Martinez</u> does not apply to the facts of this case, in which the plaintiff concurred with the informal PEBs' findings and conclusions and voluntarily waived his right to formal PEB hearings.  Mr. Williams is bound by the findings and conclusions of the informal PEBs because he concurred in those findings and waived formal PEB hearings, not because he failed to exhaust administrative remedies.

[19]Even if this court were to find that Mr. Williams did not waive his right to judicial review, his objections to the informal PEBs' determinations are not supported by the administrative record.  In order to successfully challenge his thirty percent disability ratings, Mr. Williams would need to show that the ratings were "arbitrary, capricious, unsupported by substantial evidence, or contrary to law."  <u>See</u> <u>Barnick v. United States</u>, 591 F.3d 1372, 1377 (Fed. Cir. 2010) (citing <u>Chambers v. United States</u>, 417 F.3d 1218, 1227 (Fed. Cir. 2005)).  Mr. Williams cannot meet this burden.  A thirty percent disability rating under the VASRD is characterized by a "depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, [and] mild memory loss" that lead to a servicemember's "occasional decrease in work efficiency and inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, selfcare, and conversation normal)."  38 C.F.R. § 4.130.  Mr. Williams' June 2006 PEB reported that he suffered from "[m]ajor depression manifested by . . . chronic anxiety [and] inability to perform Chaplain's duties."  AR 32.  It also noted, however, Mr. Williams' "functioning" as a screener in lieu of Chaplain's duties.  <u>Id.</u>  Mr. Williams' November 2007 PEB recorded his depression-related "termination from one job" and unattributed "doubt" regarding a position he had subsequently obtained with "the VA."  AR 41.  Mr. Williams' last PEB, finalizing his thirty percent rating and permanently retiring him from the Army, found that his symptoms included "depressed mood, anxiety and sleep impairment."  AR

### 2.      Mr. Williams also waived his right to challenge his discharge.

Because Mr. Williams voluntarily concurred in the informal PEBs' determinations

and waived the formal PEB hearings to which he was entitled under 10 U.S.C. § 1214, his

claim for back pay and reinstatement based on his allegedly wrongful discharge must also

---

55.  It further noted that, despite his "fear of being let go," he continued to enjoy full-time employment with the state of Utah and experienced only "intermittent" inability to perform occupational tasks.  Id.  In sum, the PEBs' records do not establish that Mr. Williams' condition ever gave rise to any sustained inability to work.  Given these findings, the court concludes that the PEBs' assessments of Mr. Williams' disability were not arbitrary and capricious.

Further, the administrative record establishes that Mr. Williams' symptoms did not merit a seventy percent disability rating under the VASRD.  A seventy percent disability rating is characterized by symptoms including "suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; [and] impaired impulse control (such as unprovoked irritability with periods of violence)" that lead to a servicemember's "deficiencies in most areas, such as work, school, family relations, judgment, thinking or mood."  38 C.F.R. § 4.130.  The record repeatedly establishes that Mr. Williams neither claimed to have nor in fact had any suicidal ideation.  AR 08, 11, 16, 24, 36-37, 45.  The record does not establish that Mr. Williams engaged in any obsessional rituals, or that his speech was illogical; to the contrary, Drs. Olin and Bissell both described him as "goal directed."  AR 11, 37.  Dr. Nitschke, the last doctor to examine Mr. Williams before his final PEB, reported that he was "congruent and appropriate" and that his thought processes were "logical, linear and goal directed."  AR 51.  There is no indication that Mr. Williams was unable to function independently, nor is there any indication that Mr. Williams was prone to violence at any time.  In short, Mr. Williams' doctors did not observe in him the symptoms indicative of a seventy percent disability as set forth in the VASRD.  The plaintiff argues that the list of symptoms in the VASRD is not exhaustive.  Citing Mauerhan v. Principi, 16 Vet. App. 436, 442-43 (2002), he argues that "the symptoms [in the VASRD] are not intended to constitute an exhaustive list, but rather are to serve as examples of the type and degree of the symptoms, or their effects, that would justify a particular rating."  Mauerhan, 16 Vet. App. at 442.  The court finds, however, that the "type and degree" of Mr. Williams' symptoms were not in the realm of those listed as examples in the VASARD seventy percent disability description.

For these reasons, Mr. Williams has offered the court no basis upon which it might conclude that the thirty percent disability ratings the PEBs assigned to him were arbitrary, capricious, unsupported by substantial evidence, or contrary to law.

Finally, as discussed at argument, should Mr. Williams believe based on his changed VA disability status that the Army should reexamine his thirty percent disability rating, he is not foreclosed from seeking a correction of his military record based on new evidence.

fail.  In order to maintain such a claim, a servicemember must establish either that he or she is on active duty or that his or her separation was involuntary.  See Metz, 466 F.3d at 998 ("[I]f a plaintiff cannot establish that he is currently on active duty, he must assert and ultimately establish that his separation was involuntary in order to fit within the scope of, and take advantage of, the money-mandating status of [the Military Pay Act].").  Mr. Williams has not alleged and could not establish that he is currently on active duty.  Nor can he, having waived his right to contest the findings of two informal PEBs before formal boards, establish that his separation from the military was involuntary.  A servicemember's retirement is presumed to be voluntary, Moyer v. United States, 190 F.3d 1314, 1320 (Fed. Cir. 1999); Murphy v. United States, 69 Fed. Cl. 593, 604 (2006) ("Both the Federal Circuit and the Court of Federal Claims, and their predecessors, have repeatedly found that a decision to resign or retire is presumed to be voluntary."), unless the servicemember can establish that the retirement resulted from the servicemember's mental incompetence, duress, or deception on the part of government officers.  See Warren v. United States, 41 F. App'x 408, 410 (Fed. Cir. 2002); Tippett v. United States, 185 F.3d 1250, 1255 (Fed. Cir. 1999)).  Here, for the reasons discussed above, the court has concluded that Mr. Williams voluntarily elected to concur with the assessments of the informal PEBs and accept a thirty percent disability retirement from the military and has rejected Mr. Williams' claim that he was not mentally competent to accept his disability rating and waive his right to formal PEB hearings.  The same facts and reasoning

supporting those conclusions apply in the context of Mr. Williams' claim regarding

wrongful discharge.  Mr. Williams has failed to present evidence to show that his

separation from the military was not voluntary.  Mr. Williams had the mental capacity to

make the decision to accept his military retirement and has not shown that his discharge

was caused by duress or misrepresentation.  Thus, the government is entitled to summary

judgment regarding Mr. Williams' wrongful discharge claim.[20]

---

[20]The court further notes, however, that even if it were to review Mr. Williams' wrongful discharge claim, that claim would fail because Mr. Williams has conceded that he is not fit for duty.  In Barnick, the Federal Circuit clarified that where a servicemember concedes he is not fit for duty but requests reinstatement for the purpose of contesting a disability rating, the appropriate remedy is not application of the constructive service doctrine, but rather a retroactive disability determination and payment of any wrongfully denied disability benefits:

> Here, there is no evidence that [the servicemember] would have been able to continue on active duty . . . nor is there any evidence that [the servicemember] even asserted his ability to do so at the time. . . . [I]f improperly denied disability payments in [the past], [the servicemember] should be entitled only to receive the disability payments due to be paid on that date.  We have repeatedly recognized that this remedy is appropriate where disability payments have been improperly denied. . . . The [Air Force Board for Correction of Military Records] is competent to make such a retroactive disability determination.  Here, the Board awarded [the servicemember] disability severance retroactive to [the date of his discharge], so he has already received all the relief to which he was entitled as the result of the alleged illegal discharge.

Barnick, 591 F.3d at 1380 (internal citations omitted).  Mr. Williams, like the servicemember in Barnick, concedes that he is unfit for duty and yet seeks reinstatement and back pay solely for the purpose of contesting his disability rating.  Pl.'s Resp. & Mot. 12-13 ("Mr. Williams, while acknowledging that he was and remains unfit, specifically requests re-instatement, in addition to back pay, as a remedy for his wrongful discharge claim . . . Mr. Williams desires and is ready to be re-instated to active duty to complete proper disability processing.").  In accordance with the Circuit's holding in Barnick, Mr. Williams is not entitled to reinstatement and back pay.  Rather, an appropriate remedy would be one for retroactive disability pay rather than reinstatement.  See, e.g. Army Reg. 635-40 ¶ 2-12 (regarding the Army Board for Correction of Military Records, which "provides a means for correcting an error or removing an injustice.").

## III.   CONCLUSION

For the above-stated reasons, the government is entitled to summary judgment on the grounds that plaintiff waived his claims for wrongful discharge and for review of his disability rating.  Thus, the government's converted motion for summary judgment is **GRANTED**.  The plaintiff's motion for judgment on the administrative record is **DENIED**.  The clerk is directed to enter judgment accordingly.  Each party is to bear its own costs.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge